UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 10-0133 (PLF) |
| | ) Civil Action. No. 15-0493 (PLF) |
| FLOYD CLARK, | ) |
| | ) |
| Defendant. | ) |
| | ) |

OPINION

This matter is before the Court on defendant Floyd Clark's motion [Dkt. No. 114]

to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, as amended by the

supplement to defendant's motion [Dkt. No. 132]. The United States opposes the motion. Upon

careful consideration of the parties' papers, the relevant legal authorities, the evidentiary hearing

held on June 20, 2016, the motions hearing held on January 10, 2019, and the entire record in

this case, the Court will deny Mr. Clark's motion [Dkt. No. 114] as to the claims of new

evidence and ineffective assistance of counsel, and will hold the motion in abeyance with respect

to the claim concerning the constitutionality of Mr. Clark's sentence under 18 U.S.C § 924(c), as

presented in Mr. Clark's supplement [Dkt. 132]. A separate Order giving effect to this opinion

will issue this same day.[1]

---

[1]     The Court has reviewed the following documents and accompanying exhibits in
connection with the pending motion: Indictment [Dkt. No. 6]; August 30, 2010 Order
Compelling Production of DNA ("DNA Order") [Dkt. No. 21]; September 17, 2010 Notice of
Corrected Docket Entry as to DNA Order; October 19, 2010 Civil Contempt Order ("Contempt
Order") [Dkt. 35]; December 8, 2010 Minute Entry; Verdict Form [Dkt. No. 55]; December 9,
2010 Transcript of Trial Proceedings ("Dec. 9, 2010 Trial Tr.") [Dkt. No. 67]; Presentence

## I.     PROCEDURAL HISTORY

On May 6, 2009, two men carjacked, robbed, and kidnapped Michael Walker at

gunpoint in Washington, D.C.  On May 18, 2010, after hearing testimony from Mr. Walker, a

grand jury returned a nine-count indictment charging defendant Floyd Clark in connection with

---

Investigation Report ("PSR") [Dkt. No. 72]; Judgment [Dkt. No. 84]; Amended Presentence
Investigation Report ("Amended PSR") [Dkt. No. 92]; Transcript of December 6, 2010 Motions
Hearing ("Dec. 6, 2010 Hr'g Tr.") [Dkt. No. 94]; Transcript of December 7, 2010 Trial
Proceedings ("Dec. 7, 2010 Trial Tr.") [Dkt. No. 95]; Transcript of December 8, 2010 Trial
Proceedings ("Dec. 8, 2010 Trial Tr.") [Dkt. No. 96]; Transcript of December 13, 2010 Trial
Proceedings ("Dec. 13, 2010 Trial Tr.") [Dkt. No. 97]; Defendant's June 6, 2011 Memorandum
in Aid of Sentencing ("Defendant's First Memorandum in Aid of Sentencing") [Dkt. No. 76];
Transcript of August 11, 2011 Sentencing Proceedings ("Aug. 11, 2011 Sentencing Tr.") [Dkt.
No. 98]; Transcript of June 9, 2011 Sentencing Proceedings ("June 9, 2011 Hr'g Tr.") [Dkt. No.
99]; Transcript of August 11, 2011 Sentencing Proceedings ("Aug. 11, 2011 Sentencing Tr.)
[Dkt. 98]; August 12, 2011 Defendant's Notice of Appeal ("First Notice of Appeal") [Dkt. No.
80]; May 16, 2014 Judgement of the United States Court of Appeals for the District of Columbia
Circuit ("USCA Judgement") [Dkt. No. 105]; July 10, 2014 Mandate of the United States Court of
Appeals for the District of Columbia Circuit ("USCA Mandate") [Dkt. No. 106]; Transcript of
September 29, 2014 Resentencing Proceedings ("Sept. 29, 2014 Resentencing Tr.") [Dkt. No. 112];
Amended Judgment [Dkt. No. 109]; Mr. Clark's Notice of Appeal of Amended Final Judgment
("Second Notice of Appeal") [Dkt. No. 108]; March 17 Order of the United States Court of
Appeals for the District of Columbia granting Mr. Clark's Unopposed Motion to Dismiss his
Appeal ("USCA Order of Dismissal") [Dkt. No. 113]; Mr. Clark's Pro Se Motion to Vacate, Set
Aside, or Correct Sentence Under 28 U.S.C. § 2255 ("Section 2255 Mot.") [Dkt. No. 114];
Section 2255 Mot. Declaration of Defendant ("Clark Declaration") [Dkt. No. 114-1]; Section
2255 Mot. Attachment A ("Recanting Affidavit") [Dkt. No. 114-2]; United States' Opposition to
Section 2255 Motion ("Section 2255 Opp'n") [Dkt. No. 118]; July 14, 2015 Order Appointing
Counsel ("Order Appointing Counsel") [Dkt. No. 119]; Mr. Clark's Pro Se Reply to Section 2255
Motion ("Section 2255 Pro Se Reply") [Dkt. No. 122]; Mr. Clark's Declaration in Support of
Reply to Section 2255 Mot. (Section 2255 Reply Declaration) [Dkt. No. 123]; Mr. Clark's
Supplemental Reply in Support of Motion to Vacate, Set Aside, or Correct Sentence ("Section
2255 Second Reply") [Dkt. No. 124]; Mr. Clark's Motion to Admit Hearsay ("Hearsay Mot.")
[Dkt. No. 128]; United States' Opposition to Hearsay Motion ("Hearsay Opp'n") [Dkt. No. 129];
Mr. Clark's Reply to Hearsay Motion ("Hearsay Reply") [Dkt. No. 131]; June 23, 2016
Supplement to Defendant's Motion Pursuant to 28 U.S.C. § 2255 ("Section 2255 Mot. Supp.")
[Dkt. No. 132]; United States' Supplemental Brief in Opposition to Hearsay Motion ("U.S. Suppl.
Hearsay Br.")  [Dkt. No. 133]; Mr. Clark's Supplemental Brief in Support of Hearsay Motion
("Clark Suppl. Hearsay Br.") [Dkt. No. 135]; March 1, 2016 Minute Order; Transcript of June
20, 2016 Evidentiary Hearing ("June 20, 2016 Hr'g Tr.") [Dkt. No. 136]; and June 21, 2018 Joint
Status Report [Dkt. No. 140].

the attack. The indictment included the following charges: one count of kidnapping, in violation of 18 U.S.C. § 1201(a)(1); two counts of using, carrying, possessing, or brandishing a firearm during a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A)(ii); one count of carjacking, in violation of 18 U.S.C. § 2119(2); one count of carjacking while armed, in violation of D.C. Code §§ 22-2803 and 22-4502; two counts of possession of a firearm during the commission of a crime of violence, in violation of D.C. Code § 22-4504(b); one count of armed robbery, in violation of D.C. Code §§ 22-2801 and 22-4502; and one count of unlawful possession of a firearm by an individual under felony indictment, in violation of 18 U.S.C. § 922(n).

In December of 2010, Mr. Clark was tried on these charges before a jury in this Court. At trial, Mr. Walker testified that he and Mr. Clark were in the narcotics business together. According to Mr. Walker, Mr. Clark and another man abducted Mr. Walker, robbed him of valuable possessions, and hit him in the face with a gun. Mr. Clark and the other assailant demanded $150,000, physically restrained Mr. Walker, and took him to various locations in Washington, D.C. and Maryland in an unsuccessful attempt to procure the money. Mr. Walker was able to escape and call the police. See Dec. 8, 2010 Trial Tr. at 51-143. Mr. Walker's second assailant has never been identified.

Mr. Walker was the government's chief witness against Mr. Clark at trial – indeed, he was the only witness to provide direct evidence identifying Mr. Clark as one of the perpetrators of the attacks. On December 13, 2010, a jury convicted Mr. Clark on all counts of the indictment. See Verdict Form. The Court subsequently granted the United States' motion to vacate Mr. Clark's conviction on Count Four, one of the Section 924(c) counts. See Amended Judgement; Aug. 11, 2011 Sentencing Tr. at 29. On August 11, 2011, the Court sentenced Mr.

3

Clark to an aggregate term of 284 months in prison, including a mandatory sentence of 84 months on the remaining 924(c) count, followed by five years of supervised release. See Judgment at 1-5; Aug. 11, 2011 Sentencing Tr. at 48. On May 16, 2014, the D.C. Circuit affirmed the convictions, except with respect to the sentence for the Section 924(c) conviction (Count Two), which was remanded to this Court for resentencing. See United States v. Clark, 565 F. App'x 4, 5 (D.C. Cir. 2014).[2] On September 29, 2014, the Court resentenced Mr. Clark to 60 months in prison on the Section 924(c) conviction. See Sept. 29, 2014 Resentencing Tr. at 3-6; Amended Judgment at 3. Mr. Clark's new aggregate term of imprisonment was 260 months. See id. Mr. Clark appealed the resentence but later moved to dismiss his appeal, which motion the D.C. Circuit granted. See Notice of Appeal; Order Granting Voluntary Dismissal.

On April 2, 2015, Mr. Clark filed the initial pro se motion now before this Court, a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. See Section 2255 Mot. at 1, 4-6 [Dkt. No. 114]. The Court sua sponte determined that it was in the interest of justice to appoint counsel for Mr. Clark pursuant to 18 U.S.C. § 3006A. Order Appointing Counsel at 1. Thereafter, Mr. Clark's counsel replied to the government's opposition to the Section 2255 motion, see Section 2255 Second Reply, and also filed a June 2016 supplement to the Section 2255 motion that added a new claim, see Section 2255. Mot. Supp. at 1-2 [Dkt. No. 132]. As amended, Mr. Clark's motion asserts four total grounds for relief, three of which the Court resolves today. First, Mr. Clark argues that an August 1, 2014 affidavit from Mr. Walker

---

[2]     The court of appeals remanded for this Court to take account of recent guidance from the Supreme Court that any fact entailing a mandatory minimum sentence – e.g., for a carjacking charge, the fact that the defendant also brandished a firearm – constitutes an element of the charged offense that must be submitted to the jury. See Alleyne v. United States, 570 U.S. 99 (2013).

recanting his trial testimony constitutes newly discovered evidence that the sentence was imposed in violation of the Constitution or laws of the United States or was otherwise subject to collateral attack. See Section 2255 Mot. at 4. Second, Mr. Clark argues that his trial counsel's failure to object to a sentencing enhancement for obstruction of justice, or his decision to withdraw that objection, constituted ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution. See Sec. 2255 Mot. at 5. Third, Mr. Clark contends that the decision of his appellate counsel not to include the sentencing enhancement as a basis for appeal likewise constituted ineffective assistance of counsel. See Sec. 2255 Mot. at 6. These three claims were presented in Mr. Clark's initial pro se motion and are resolved by today's opinion and order. In the supplement to his initial motion, Mr. Clark also raises a fourth basis for relief, which must be deferred to another day: whether his sentence on Count Two for violating 18 U.S.C. § 924(c) is now unconstitutional following the Supreme Court's decisions in United States v. Johnson, 135 S. Ct. 2551 (2015), and Sessions v. Dimaya, 584 U.S. ___, 138 S. Ct. 1204 (2018). See Section 2255 Mot. Supp. at 1-2.[3]

---

[3]    In Johnson and Dimaya, the Supreme Court held that the term "crime of violence" is unconstitutionally vague under certain statutes. Mr. Clark argues that 18 U.S.C. 924(c), under which he was sentenced for use of a firearm in furtherance of a "crime of violence," is likewise unconstitutionally vague. The parties agreed that this issue should be considered only after the D.C. Circuit decided a motion for panel rehearing in United States v. Eshetu, 863 F.3d 946 (D.C. Cir. 2017), which concerns the constitutionality of the residual clause of 18 U.S.C. § 924(c). See June 21, 2018 Joint Status Report. Thereafter, the D.C. Circuit granted the petition for rehearing, vacated appellants' 924(c) convictions, and found Section 924(c)(3)(B) void for vagueness. See United States v. Eshetu, 898 F.3d 36 (D.C. Cir. 2018), pet. for rehr'g en banc denied sub nom. United States v. Sorto, USCA Case No. 15-3023, Dkt. No. 1773334 (Feb. 13, 2019). The constitutionality of Section 924(c)(3)(B) is now before the Supreme Court, however, in United States v. Davis, No. 18-431, which was argued on April 17, 2019. The United States filed a motion to stay the mandate in Eshetu pending the Supreme Court's ruling in Davis. See United States v. Sorto, Dkt. No. 1773928 (Feb. 19, 2019). The D.C. Circuit granted the motion to stay. Id., Dkt. No. 1781257 (April 5, 2019). Therefore, the Court will refrain from ruling on Mr. Clark's Section 924(c) argument until after the Supreme Court has issued its opinion in United States v. Davis.

In March of 2016, the Court granted Mr. Clark's request for an evidentiary hearing on the Section 2255 motion. See March 1, 2016 Minute Order. Before the evidentiary hearing, however, Mr. Clark filed a motion to admit in evidence Mr. Walker's recanting affidavit under an exception to the rule against hearsay. See Hearsay Mot. at 1. Mr. Clark argued that, if Mr. Walker invoked his Fifth Amendment privilege against self-incrimination and refused to testify at the evidentiary hearing, Mr. Walker's affidavit should be admitted in lieu of his testimony as a statement against interest under Rule 804(b)(3) of the Federal Rules of Evidence. See id. at 2-3.

At the evidentiary hearing on June 20, 2016, Mr. Walker asserted his Fifth Amendment privilege against self-incrimination and refused to testify either to the substance of the recanting affidavit or the circumstances of its creation. The Court concluded that it lacked the power to grant Mr. Walker immunity for his testimony, and the government declined to offer him immunity. See June 20, 2016 Hr'g. Tr. at 25-33.

Following the evidentiary hearing, and upon consideration of the full record, the Court granted Mr. Clark's motion to admit Mr. Walker's recanting affidavit under Rule 804(b)(3) of the Federal Rules of Evidence. The Court found that the affidavit amounted to a statement against Mr. Walker's interest and that the circumstances under which the statement was made offered evidence of its reliability. See United States v. Clark, 325 F. Supp. 3d 191 (D.D.C. 2018). In so doing, the Court offered no view on the truth of the statements contained within the recanting affidavit. That matter lies at the heart of the Section 2255 motion, which is now ripe for the Court's decision.

## II.   NEW EVIDENCE CLAIM: FACTUAL BACKGROUND

### A.  The Evidence at Trial

At trial, the government presented four lay witnesses who observed aspects of the crime: the victim Michael Walker, Yonata Kalbi, Christel Antoine, and Carmen Isler.  The government also presented testimony from law enforcement personnel: Detective Elmer Baylor, Jr. of the Metropolitan Police Department of the District of Columbia ("MPD"), MPD Officers Michael DePrince and Tony Nwani, and FBI Special Agent Chad Fleming.  Malcolm Drewery, a courtroom deputy clerk at the Superior Court of the District of Columbia, testified as an expert witness.  The government also presented testimony from two women with whom Mr. Clark has children: Leslie Warner and Mercedy's [sic] Phillips.  The defense did not offer any witnesses.

### 1.  Michael Walker's Testimony

At trial, Michael Walker testified that he and Mr. Clark began selling crack cocaine together around August or September of 2008: Mr. Clark served as an intermediary between Mr. Walker and the street-level dealers, identifying purchasers and facilitating transactions. See Dec. 8, 2010 Trial Tr. at 57-61.[4]  Mr. Walker said that Mr. Clark called him on May 6, 2009 to suggest that they meet at a shopping center in Southeast Washington, D.C. to discuss a buyer interested in purchasing $30,000 of narcotics, a larger transaction than those Mr. Clark customarily facilitated for Mr. Walker. See id. at 65-67, 70.  Mr. Walker drove his wife's car, a red 2008 Toyota Highlander, to Benco Shopping Center at East Capitol Street and Benning Road, S.E. See id. at 68-71, 96.  When Mr. Walker arrived at the shopping center he received a

---

[4]      Mr. Walker testified that he received immunity from prosecution in exchange for his trial testimony. See Dec. 8, 2010 Trial Tr. at 54 (citing Gov't Ex. 9, Sept. 14, 2010 Immunity Letter).  He also acknowledged that he had multiple prior convictions for forgery and fraud. See id. at 61.

call from Mr. Clark, who was using a phone number unfamiliar to Mr. Walker. Mr. Clark revised the meeting location to Queens Stroll, S.E., a nearby street formerly known as Drake Place. Id. at 61-62. Upon arriving there, Mr. Walker saw Mr. Clark standing beside a black SUV. Mr. Clark entered the front passenger seat of Mr. Walker's car, and Mr. Walker then received another call from the unfamiliar phone number. Mr. Clark explained that it was the prospective buyer of drugs, who had been waiting in the black SUV.

Shortly thereafter, Mr. Walker testified, the prospective buyer entered the rear seat of Mr. Walker's car. See Dec. 8, 2010 Trial Tr. at 74-76. When Mr. Walker questioned Mr. Clark about the prospective buyer, Mr. Clark pulled a large chrome semiautomatic gun from under his shirt and told Mr. Walker, "you know what time it is." See id. at 78-83. Mr. Clark ordered Mr. Walker into the rear seat of the Toyota Highlander, and the prospective buyer drove the car to a nearby alley. There, Mr. Clark tore Mr. Walker's gold chain from his neck and took his watch, money, and wallet. Mr. Clark attempted to place a bag over Mr. Walker's head, which Mr. Walker specifically identified as a "Downtown Locker Room Bag." Id. at 82. Mr. Walker refused to comply. A police officer later testified that he recovered certain articles consistent with this account from the 2008 Red Toyota Highlander belonging to Mr. Walker's wife. See Part II.A.3, infra.

Mr. Walker further testified that, after Mr. Clark and the other man robbed him, the two assailants began demanding substantial sums of money from Mr. Walker – about $150,000. See Dec. 8, 2010 Trial Tr. at 81-83. While Mr. Clark held Mr. Walker at gunpoint in the rear seat of the Highlander, the other man drove Mr. Walker's car to various locations where they suspected Mr. Walker was keeping money. See Dec. 8, 2010 Trial Tr. at 83-104. Believing that Mr. Walker must keep money in a safe at his home, the men first drove to Mr. Walker's

house in Southeast Washington. Upon arriving there, Mr. Walker saw his wife at the door watching his young nephew play in the yard. See id. at 83-84. Mr. Walker attempted to dissuade the men from entering his home by stating that a police officer lived next door (he testified at trial that an officer owned the property but did not live there). When Mr. Clark continued to threaten entry, Mr. Walker explained that his safe sat on the back porch, rather than inside the house. Id. at 85-86. As the three men drove around the block to another parking lot, Mr. Clark threatened to kill Mr. Walker's wife if the safe did not contain sufficient money. Knowing that the safe contained no money, Mr. Walker "switched up" his story again to claim that he had money at a nearby bank. Mr. Clark refused to go to the bank for fear of being caught, saying "I know what you trying to do." See id. at 84-86.

Next, Mr. Walker testified, the two assailants drove him to another parking lot. Mr. Walker attempted to escape from the car, but Mr. Clark struck him with his gun above the left eye, causing substantial bleeding. Mr. Walker testified that Mr. Clark also hit him on the knee, forced him to lie down on the floor between the back seat and the front seat, and pinned him down with the seat in a way that prevented any movement. See Dec. 8, 2010 Trial Tr. at 86-89. In substantial pain, Mr. Walker told his assailants that he had money stored in a private unit at a storage facility on Kenilworth Avenue in Bladensburg, Maryland, and that he would give them $75,000 of the $125,000 he had stored there. At trial, Mr. Walker indicated that this too was a ruse: the facility came to mind because a family member had a unit at a nearby U-Haul facility, but Mr. Walker did not have a unit at the storage facility or otherwise have access to money there. Even so, Mr. Clark directed the other assailant to drive to the storage facility. Id. at 89-90.

Mr. Walker warned his assailants that entering the facility with his face covered in blood was likely to arouse suspicion, so he requested that they "clean [him] up." Dec. 8, 2010 Trial Tr. at 90-91. At this request, Mr. Walker heard Mr. Clark and the other man discussing a stop at 7-Eleven or CVS to get bandages and water. The car stopped and at least one person got out, though Mr. Walker was still pinned to the floor of the car and could not see directly. Id. at 91-93. Another witness, an employee of a 7-Eleven in the area of the attack, later offered testimony that also speaks to this portion of the events. See Part II.A.2, infra.

Mr. Walker further testified that, after the stop at 7-Eleven, the assailants drove him to a storage facility on Kenilworth Avenue in Bladensburg, Maryland. Mr. Walker's testimony describes the location variously as a U-Haul or U-Storage facility. See Dec. 8, 2010 Trial Tr. at 89, 94. There, the assailants allowed Mr. Walker to sit up in the back seat of the car. According to Mr. Walker, Mr. Clark wiped Mr. Walker's face with water to clean off blood, bandaged his head, and "said he was sorry." Id. at 95. Mr. Clark gave one of his own shirts to Mr. Walker because Mr. Walker's shirt was stained with blood. See id. After Mr. Clark bandaged his head, Mr. Walker asked to sit and collect himself for several minutes because his ankle was hurting after being pinned down. He testified that, in reality, he was planning to escape from his assailants on foot. Id. at 95-96. Mr. Walker was permitted to rest for about ten minutes, after which Mr. Clark and Mr. Walker exited the car and went into the office of the storage facility. Id. at 97.

Mr. Walker testified that, once inside the office of the storage facility, he and Mr. Clark encountered a young woman at the desk. Mr. Walker told her that he wanted access to his storage unit and identified himself using his real name. Dec 8, 2010 Trial Tr. at 98. When the woman told Mr. Walker that no unit was rented to someone of his name, Mr. Walker fabricated

an explanation to Mr. Clark: that he had a private "off-the-books" storage unit, and that only an employee named Pat could open it. See id. at 100. Continuing his attempt to deceive Mr. Clark, Mr. Walker asked when the next shift would begin, but the woman indicated she was working the day's final shift and that no one else would be working that day. As the two men were leaving the office, Mr. Clark asked the desk attendant if anyone named "Pat" was actually an employee at the U-Store facility; Mr. Walker believes the attendant said no. See id. at 100. Another witness, the storage facility desk attendant, later offered testimony about this portion of the events. See Part II.A.2, infra.

As Mr. Clark and Mr. Walker exited the office, Mr. Walker ran across Kenilworth Avenue to an apartment complex called Kenilworth Towers. He entered the complex's office and asked a person working there if he could use the phone. Mr. Walker testified that he called the police but hung up immediately in order to call his wife and instruct her to lock the doors of their home, fearing that his assailants would return to his house. He called 911 again, and shortly thereafter the police and an ambulance arrived and took Mr. Walker to the hospital. See Dec. 8, 2010 Trial Tr. at 103-04. A resident manager at Kenilworth Towers later offered testimony concerning Mr. Walker's conduct at the apartment complex. See Part II.A.2, infra.

Mr. Walker testified that, when the police first arrived at Kenilworth Towers Apartments on the day of the attack, he spoke with Detective Elmer Baylor, Jr. of the Metropolitan Police Department of the District of Columbia. See Dec. 8, 2010 Trial Tr. at 104. He initially told Detective Baylor that he had been abducted near "51st and Fitch Streets." See id. at 132; see also Dec. 9, 2010 Trial Tr. at 197; Defense Ex. 4 (stipulating the placement of a surveillance camera "at 51st and Fitch Streets, Southeast"). He described his two assailants but stated that he did not know their identities. See Dec. 8, 2010 Trial Tr. at 132. Later, Mr. Walker

revised the location of his abduction and told the prosecutor and the detectives that he did in fact know one of the assailants, whom he identified as someone named "Floyd." See id. at 106. Mr. Walker testified that he eventually learned "Floyd's" last name through a Department of Public Works employee who worked at the impound lot where the Red 2008 Toyota Highlander was impounded after the attack. See id. at 107-08, 132-33. Based on the first and last name given by Mr. Walker, police showed Mr. Walker a single photo of Floyd Clark. See id. at 108. Mr. Walker confirmed that the man depicted in the photograph – the defendant – was one of his two assailants.

At trial, Mr. Walker explained that he professed ignorance of his attacker's identity in his initial report to the police because he had planned to kill Mr. Clark. He discarded this plan and decided to identify Mr. Clark to the police after speaking to his wife. See Dec 8, 2010 Trial Tr. at 105. Mr. Walker admitted at trial that he had lied to the police during his initial encounter when he denied knowing his attacker. See id. at 139. Shortly thereafter, however, he testified that "Actually, I never lied. I don't feel I lied." See id.

After he identified Mr. Clark to the police, Mr. Walker testified before a grand jury. Dec. 8, 2010 Trial Tr. at 125 (discussing Government Exhibit 1). Although Mr. Walker testified at trial pursuant to an agreement immunizing him from prosecution for certain crimes, no such agreement was in place at the time of his grand jury testimony concerning the crimes. See id. at 126-31. Following Mr. Walker's testimony, the grand jury indicted Mr. Clark.

2. Testimony of Lay Witnesses

Yonata Kalbi, Christel Antoine, and Carmen Isler observed Mr. Walker and another man on May 9, 2010. Although none of them identified Mr. Clark, their testimony corroborated certain other aspects of Mr. Walker's description of the attack.

Mr. Yonata Kalbi, the store manager of a 7-Eleven, testified that he was working at the cash register of a 7-Eleven located at 4199 Kenilworth Avenue in Bladensburg, Maryland on May 6, 2009. See Dec. 8, 2010 Trial Tr. at 150-53. Mr. Kalbi testified that on that day a man came into the store who appeared to be in a hurry: He came directly to the register and tried to cut the line. The man bought a box of bandages and left without his change. See id. at 154, 156-57, 170. Mr. Kalbi provided video surveillance footage taken during this interaction to the police a few days later. See id. at 161-63. At trial, Mr. Kalbi reviewed the surveillance footage and still frame images taken from it. He identified himself and pointed out the man who bought bandages. See Dec. 8, 2010 Trial Tr. at 159-61 (citing Gov't Ex. 66). Mr. Kalbi further testified that the man in the surveillance footage "looks like" the man who bought bandages on May 6, 2009. See id. at 163-67 (discussing Gov't Ex. 7). At trial, Mr. Kalbi was not asked to identify Mr. Clark as the man who bought the bandages.

Ms. Christel Antoine worked at the Kenilworth Avenue U-Store facility on May 6, 2009. That day, two men entered her store who were acting "unusual," in that they did not come straight to the counter and did not make eye contact with Ms. Antoine at first. See Dec. 9, 2010 Trial Tr. at 11. One man was wearing a hat but the other was not. See id. at 13. The man without the hat asked her to access an account for "Michael," which is Mr. Walker's first name. See id. at 13, 16. Ms. Antoine responded that the system did not have a unit belonging to someone of that name. See id. at 14. The man with the hat seemed agitated during the exchange, and the two men began to leave. See id. at 17. The man with the hat returned to ask if someone named "Pat" worked there, and Ms. Antoine said no. See id. at 18. After the man with the hat left the U-Store, the man without the hat started to run across the street toward Kenilworth Towers, and a red car picked up the man with the hat. See id. at 18-19.

A detective showed a photo array to Ms. Antoine and asked her to identify anyone who looked familiar. See Dec. 9, 2010 Trial Tr. at 19-20. She testified that she "got a better look" at the man without the hat because he had made eye contact with her when asking for the storage unit. See id. at 20-21. She explained that the two men looked like brothers. See id. at 22. She selected one photograph, No. 6, but could not determine precisely which one of the men it depicted – she thought it looked like the man without the hat. See id. at 22-23. A police witness later confirmed that the photo array contained a picture of Mr. Clark, but that the photograph Ms. Antoine selected was not Mr. Clark's photo. See id. at 146. In fact, the individual Ms. Antoine selected was incarcerated at the time that the two men visited the U-Store. See id. at 146-49.

At trial, Ms. Antoine identified herself in the video surveillance footage from the U-Store. See Dec. 9, 2010 Trial Tr. at 23-26 (citing Gov't Ex. 8). She also pointed out the man without the hat who asked about a unit belonging to "Michael," as well as the man with the hat who came back in to ask if "Pat" worked there. See id. at 31-32. She was not asked to identify either man in the video as Mr. Clark.

Ms. Carmen Isler was the resident manager of Kenilworth Apartments across Kenilworth Avenue from the U-Store. See Dec. 8, 2010 Trial Tr. at 174-75, 177-78. At trial, she testified that on May 6, 2009, a man with a bandage on his forehead walked into the office looking "nervous." See id. at 179-80. He was talking about "a car or something." See id. at 182. He made a call to the police, and possibly more calls, using the courtesy phone. See id. at 183. The police arrived a short time later. See id. at 183.

### 3. Circumstantial Evidence

Mr. Walker offered the only direct evidence implicating Mr. Clark as one of the perpetrators of the crimes. The government argued, however, that additional facts constituted circumstantial evidence of Mr. Clark's guilt, most notably Mr. Clark's refusal to comply with two court orders requiring him to submit to DNA tests and hair samples and his purported efforts to evade arrest for the attack of Mr. Walker.

#### a. Physical Evidence and Refusal of DNA Sample

Officer Michael DePrince of the Metropolitan Police Department was a member of the mobile crime scene unit on May 6, 2009. Dec. 9, 2010 Trial Tr. at 104. He processed a red 2008 Toyota Highlander belonging to Mr. Walker's wife, from which he recovered a number of items: a plastic bag from Downtown Locker Room, see id. at 111 (citing Gov't Ex. 4); a gold-colored metal link, see id. at 113-14 (citing Gov't Ex. 6); a shirt from the rear drivers' side of the car that appeared to be stained with dried blood, see id. at 103, 106-07 (discussing Gov't Ex. 1); a car's floor mat, stained with what appeared to be dried blood, see id. at 108-09 (discussing Gov't Ex. 2); a box of Band-Aid brand bandages, see id. at 110-11 (discussing Gov't Ex. 3); and a Deer Park brand plastic water bottle from the rear seat, see id. at 112-13.[5] Officer DePrince was not able to recover any usable fingerprints from the car, id. at 114, but he did collect "trace evidence" that could be tested for DNA, including skin cells, fibers, and hairs, see id. at 104.

Special Agent Chad Fleming of the Federal Bureau of Investigation's Violent Crime Task Force testified that his unit was responsible for investigating certain robberies,

---

[5] Mr. Walker testified that his attacker tried to cover Mr. Walker's face with a bag from Downtown Locker Room, tore a gold chain from around his neck, struck a blow that drew blood, gave Mr. Walker his own shirt, and cleaned and bandaged Mr. Walker's wound. See Part II.A.1, supra.

kidnappings, and wanted fugitives in Washington, D.C. and for booking certain arrestees.

Beginning in early 2010, arrestees processed at the FBI's Washington Field Office had their

fingerprints taken and were given a buccal swab (a sample of the cells from the cheek or mouth)

to collect DNA for forensic analysis. See Dec. 8, 2010 Trial Tr. at 185-87. Special Agent

Fleming helped to process the arrest of Mr. Clark on April 20, 2010, at which time he took

fingerprints and a buccal swab from Mr. Clark. See id. at 185-86, 192-94. Mr. Clark agreed to

provide the samples, though it "took a little convincing" from Special Agent Fleming. Id. at 192.

      Officer Tony Nwani of the Metropolitan Police Department worked on forensics

for the MPD mobile crime lab. See Dec. 8, 2010 Trial Tr. at 205. Several months after Mr.

Clark's arrest, Officer Nwani met with Mr. Clark to attempt to collect further samples. He first

attempted to collect DNA and hair samples from Mr. Clark on September 3, 2010. See id. at

207-08. Officer Nwani showed Mr. Clark an August 30, 2010 order of this Court that authorized

collection of the samples. See id. at 209-10; see also DNA Order (indicating that the order was

signed on August 30, 2010 and filed on August 31, 2010). The order does not have a seal or

long-form signature; instead, the order issued from "Paul L. Friedman, United States District

Judge," immediately above which appear the characters "/s/". See id. at 225-31. Mr. Clark

refused to provide DNA and hair samples, noting that he had previously given a saliva swab and

head hair. See id. at 208.

      At trial, the parties stipulated that a hearing was held on September 16, 2010. At

the hearing, the parties stipulated, the Court advised Mr. Clark that its August 30, 2010 order

requiring provision of DNA samples was valid but that the Court would nevertheless re-issue a

certified copy of that order.[6] The parties further stipulated that Mr. Clark was told during the hearing that he risked prosecution and incarceration if he failed to provide DNA and hair samples. See Dec. 8, 2010 Trial Tr. at 228-229.

Officer Nwani testified that he made another attempt to collect samples from Mr. Clark on October 7, 2010, during which Mr. Clark's counsel was present. See Dec. 8, 2010 Trial Tr. at 213. Officer Nwani presented the re-issued order authorizing the collection. See id. at 213-14, 220 (referring to Gov't Ex. 11). The order features the Court's long-form signature, rendered in handwriting script. See id. at 225-26. Through counsel, Mr. Clark again refused to provide DNA or a hair sample. See id. at 218-19 (citing Gov't Ex. 12, Refusal Form).

At a pre-trial hearing on October 18, 2010, the Court held Mr. Clark in contempt of court and ordered him to be incarcerated until he complied with the order to provide samples, or until he faced trial. See Contempt Order at 1-2. Mr. Clark never provided the samples, and contempt was lifted only on December 8, 2010 at the commencement of trial. December 8, 2010 Minute Entry. As a consequence, Mr. Clark did not receive a time served deduction from his sentence for the 49 days he served while in contempt of court. See Defendant's First Memorandum in Aid of Sentencing at 3-4; Aug. 11, 2011 Sentencing Tr. at 30-31.

b. Purported Efforts to Evade Arrest

Mr. Malcom Drewery, a courtroom deputy clerk in the Superior Court of the District of Columbia, testified as an expert witness that defendants in the Superior Court receive oral and written notice of court appearances and are warned of the penalties for failing to appear.

---

[6]     The Court re-issued the August 30, 2010 order on the same day of the status conference. The reissued order contained the Court's long-form signature but was otherwise identical to the August 30, 2010 Order. See Dec. 8, 2010 Trial Tr. at 225-26; September 17, 2010 Notice of Corrected Docket Entry.

See Dec. 9, 2010 Trial Tr. at 82-83. Mr. Drewery testified that Mr. Clark appeared as required in the Superior Court for charges on felony case number 2008 CF212922, which is unrelated to the instant case, from June 2008 to April 2009. He failed to appear, however, for a June 15, 2009 trial in that case. See id. at 85-94 (citing Gov't Ex. 19, a copy of the court file 2008 CF2012922).

Ms. Leslie Warner is the mother of one of Mr. Clark's children. See Dec. 9, 2010 Trial Tr. at 38. Ms. Warner testified that she saw Mr. Clark in the spring of 2009. Mr. Clark told her that he was moving to Georgia without specific explanation, but Ms. Warner testified that Mr. Clark had "always talked about Georgia," had suggested he needed to take care of some business there, and had indicated that members of his family lived there. See id. at 43-44, 58, 69. In 2008, Ms. Warner testified, Mr. Walker was using a phone number with area code 404, a Georgia area code. Id. at 59. When he left for Georgia, Mr. Clark promised Ms. Warner that he would return for the birth of their son, but he was not present for the birth on July 26, 2009. See id. at 38. He returned in the fall of 2009 and borrowed Ms. Warner's car. Ms. Warner testified that, one day, Mr. Clark failed to pick her up from work as promised, instead accusing her of sending the police after him. Mr. Clark abandoned the car, and when Ms. Warner recovered it police approached her to ask about Mr. Clark. Id. at 46-51.

Ms. Mercedy's [sic] Phillips is the mother of two of Mr. Clark's children. See Dec. 9, 2010 Trial Tr. at 69. She is a corrections officer. See id. She has known Mr. Clark for many years and told police that she communicated with Mr. Clark on a phone number beginning with area code 404. See id. at 71-73; see also id. at 59 (indicating that 404 is a Georgia area code). Ms. Phillips ended her romantic relationship with Mr. Clark in May 2008. See id. at 74.

Detective Elmer Baylor, Jr. of the Metropolitan Police Department testified that he suspected that Mr. Walker was lying during their initial encounter, during which Mr. Walker claimed that he did not know who attacked him. See Dec. 9, 2010 Trial Tr. at 193-95. Once Mr. Walker identified Floyd Clark as one of his assailants, Detective Baylor attempted without success during the spring and summer of 2009 to locate Mr. Clark and arrest him. See Dec. 9, 2010 Trial Tr. at 152-54. On October 14, 2009, Detective Baylor received a tip that Mr. Clark was in the Washington, D.C. area. See id. at 156. Detective Baylor went to Ms. Warner's residence in Bowie, Maryland, where he saw her SUV and set up surveillance that night. See id. at 157. Detective Baylor began tailing the SUV the next day after he received a tip from a team member that Mr. Clark may have been driving it. See id. at 160. He determined that Mr. Clark was not driving the SUV but noticed a second person in the passenger seat with the seat all the way down. See id. at 161. When Officer Baylor made eye contact with the driver, he "abruptly" pulled off the street and onto another course. Id.

Detective Baylor tried to follow the SUV but lost sight of it. See Dec. 9, 2010 Trial Tr. at 161. He soon found the car "abandoned" on North Capitol Street between V Street and Rhode Island Avenue. See id. at 162. Mr. Clark retuned to the SUV about two hours later. He saw a man who resembled the image of Floyd Clark. See id. at 163-64. Detective Baylor called for backup in order to arrest Mr. Clark, but lost sight of him again. See id. at 165-66. When Leslie Warner later entered the SUV, police officers approached and asked about Mr. Clark. See id. at 166.

The government offered photographs of the location where the SUV was found and a demonstrative exhibit tracking the route of the SUV. See id. at 166-68 (discussing Gov't Exs. 31 and 32). The government also offered Exhibits 21 and 22, pictures of Mr. Clark from

2009. See id. at 190-91. Finally, the government introduced Exhibit 13, AT&T phone records from Mr. Clark's account for a phone number with area code 404, a Georgia area code.

## B. The Recanting Affidavit

Mr. Clark filed the instant Section 2255 motion pro se on April 2, 2015, more than four years after his conviction at trial. The first ground cited for vacating his sentence was newly discovered evidence: an August 2014 letter to Mr. Clark from Ronetta Johnson, Chief Investigator at Above and Beyond Investigating, LLC, containing a witness statement from Mr. Walker. The statement was handwritten in black ink by Ms. Johnson, amended in several respects by Mr. Walker in blue ink, and signed on each page by Mr. Walker in blue ink and Ms. Johnson, as witness, in black ink. The final page of the statement contains a certification that Mr. Walker had read the statement and that "this statement is true, correct, and complete to the best of my knowledge," below which is Mr. Walker's signature in blue ink. See Recanting Affidavit at 12. Ms. Johnson signed as witness in black ink, and the statement is notarized. Id.

Mr. Walker's statement recants the central aspect of his trial testimony: his identification of Mr. Clark as one of the two men who attacked him on May 6, 2009. In the affidavit Mr. Walker says that, in fact, he "did not know who" committed the crimes against him, and that he said as much to the police when they arrived at Kenilworth Towers shortly after his escape. See Recanting Affidavit at 4. The recanting affidavit explains that "I changed my story to the police and named Floyd because I wanted to seek revenge against him because I was mad since finding out about an allegation that he was having an [sic] sexual encounter with my wife . . . ." Id. at 4-5. The affidavit contains a second motive as well: Mr. Walker alleges that

> the police encouraged me to come up with a story and gave me a
> couple of days to do so. I made up a lot of details to make the story
> sound believable that Floyd was the suspect. I was being threatened

> by the police to help them make a case. I was on probation, so the
> police told me that they could see to it that my judge revoked my
> probation . . . .

Id. at 6-7. Mr. Walker did not elaborate on which of the "many details" he made up, but the

affidavit is unambiguous in its primary thrust: "I know for a fact that Floyd did not commit any

crimes at all against me." See id. at 10. In explaining why he later decided to recant his trial

testimony, Mr. Walker remarked that he

> felt bad since Floyd was convicted but I could not change my story
> since going to the grand jury. . . . Once I found out that Floyd really
> did not sleep with my wife, I wanted to correct this wrong but was
> scared to do so. I have told my wife that I was going to make it
> right, which is why I am coming forward now.

See Recanting Affidavit at 10-12.

Shortly before the evidentiary hearing on Mr. Clark's Section 2255 motion, Mr.

Clark filed a motion to admit the affidavit itself in evidence, anticipating that Mr. Walker might

decline to testify at the hearing. See Hearsay Mot. at 2.

### C. The Evidentiary Hearing

On June 20, 2016, the Court held an evidentiary hearing on the Section 2255

motion and heard oral argument on Mr. Clark's motion to admit hearsay. As Mr. Clark

anticipated, Mr. Walker invoked his Fifth Amendment privilege against self-incrimination and

refused to answer questions about his purported recantation for fear that doing so could expose

him to criminal liability for perjury. See June 20, 2016 Hr'g Tr. at 10-12, 21-25. The Court

concluded that Mr. Walker properly invoked the privilege as to both the substance of the

recantation and the circumstances surrounding his decision to sign the affidavit. See id. at 16-18,

25-26. The Court determined that it lacked authority to grant use immunity to Mr. Walker absent

a request from the United States, a request the government refused to make. See United States v.

Clark, 325 F. Supp. 3d 191, 194 (D.D.C. 2018); June 20, 2016 Hr'g Tr. at 28, 32-33. The Court then heard testimony from three witnesses regarding the affidavit and regarding Mr. Walker's statements to them concerning the affidavit.

Ms. Ronetta Johnson, Chief Investigator at Above and Beyond Investigations, LLC, testified that one of Mr. Clark's family members contacted her to indicate that Mr. Walker was willing to speak to her about Mr. Clark's case. See June 20, 2016 Hr'g Tr. at 36-38, 44-45, 49. Soon thereafter, on August 1, 2014, Mr. Walker came to her office for an interview. Ms. Johnson testified that she drafted the recanting affidavit for Mr. Walker based on their conversation, after which Mr. Walker reviewed the statement, made revisions, and signed each page. Ms. Johnson stated that she did not suggest any changes to Mr. Walker, that he signed the affidavit voluntarily, and that she gave no advice concerning the expiration of any statute of limitations for perjury. Ms. Johnson further testified that she had the affidavit notarized that same day by a notary in her office building. See United States v. Clark, 325 F. Supp. 3d at 197. See also June 20, 2016 Hr'g Tr. at 36-52.

Mr. Michael Hailey, supervisor of the Witness Security Section of the U.S. Attorney's Office for the District of Columbia, testified that Mr. Walker called the U.S. Attorney's Office in February of 2015 to express concerns for his safety. Mr. Walker said that a friend of Mr. Clark's had approached Mr. Walker in a barbershop and told him that Mr. Clark's case was "up for appeal" and that Mr. Walker could change his story. Mr. Hailey further testified that, during their meeting, Mr. Walker said that the investigator visited his home to take a statement and that the investigator advised Mr. Walker on the statute of limitations for perjury. Mr. Hailey testified that, by Mr. Walker's account, he read and signed the recantation drafted by

the investigator "knowing that what he had signed was not the truth." United States v. Clark, 325 F. Supp. 3d. at 194-95. See also June 20, 2016 Hr'g Tr. at 57-62.

        Mr. Tommy Miller, lead criminal investigator for the Criminal Investigations and Intelligence Unit of the U.S. Attorney's Office for the District of Columbia, testified that he met on June 15, 2016 with Mr. Walker, Mr. Walker's counsel, and Assistant U.S. Attorney James Sweeney. Mr. Miller testified about Mr. Walker's comments on the affidavit in that meeting: that the affidavit reflected "the investigator's words, not [Mr. Walker's];" that "[t]he investigator wrote [the statement] on her own" without information from Mr. Walker; and that Mr. Walker signed the statement written by the investigator without reading it. According to Mr. Miller, Mr. Walker explained in the June 2016 meeting that his recanting affidavit was false and that it was indeed Mr. Clark who had attacked him on May 6, 2009. Mr. Walker said that he signed the affidavit because he wanted leniency for Mr. Clark and did not want him to serve any additional time. United States v. Clark, 325 F. Supp. 3d. at 195. See also June 20, 2016 Hr'g Tr. at 73-78.

        The Court decided to admit the affidavit under the hearsay exception for statements against interest made by unavailable declarants that are supported by corroborating circumstances indicating their trustworthiness. United States v. Clark, 325 F. Supp. 3d. at 198 (citing FED. R. CIV. P. 804(b)(3)). In so ruling, however, the Court emphasized that its decision to admit the affidavit did not constitute a finding that Mr. Walker's affidavit is more credible than his trial testimony or more credible than what he told the two representatives of the U.S. Attorney's Office. See id. at 196. Nor did the Court need to decide whether to credit Ms. Johnson's testimony or the testimony of Mr. Hailey and Mr. Miller regarding the conversations they had with Mr. Walker, or whether the recanting affidavit is sufficiently persuasive to entitle Mr. Clark to Section 2255 relief. See id. For the reasons described in the

Court's opinion of September 18, 2018, the affidavit was supported by corroboration sufficient to admit it under Rule 804(b)(3), as were Mr. Walker's statements to Mr. Hailey and Mr. Miller. See United States v. Clark, 325 F. Supp. 3d. at 198.[7] In deciding to admit the affidavit, the Court specifically reserved the central questions for later resolution: the question of "the truth of what is asserted by [Mr. Walker's] hearsay statement[], the credibility of witnesses, and the weight to be accorded evidence." See id. The Court now turns to these questions.

### III.   NEW EVIDENCE CLAIM: ANALYSIS

*A. Legal Standard*

1.   Standards for Rule 33 New Trial Motions and Section 2255 Collateral Attacks

The parties' papers raise the possibility that Mr. Clark's Section 2255 motion may be time-barred. See Section 2255 Opp'n at 10, n. 3; Section 2255 Second Reply at 14-15. It is not. Rule 33 of the Federal Rules of Criminal Procedure provides that a court may vacate a judgment and grant a new trial "if the interest of justice so requires." FED. R. CRIM. P. 33(a). The Rule also provides that "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." FED. R. CRIM. P. 33(b)(1). Mr. Clark was found guilty in December of 2010 and filed the instant motion – which relies in part on claims of new evidence (the recanting affidavit) – in April of 2015. If the Rule 33 time limit applies, therefore, Mr. Clark's new evidence claim is time-barred. By contrast,

---

[7]       The Court also determined that it would consider the testimony of Mr. Hailey and Mr. Miller if the United States chose to call them as witnesses at the hearing on the Section 2255 motion. On January 10, 2019, the Court held a supplemental hearing on the Section 2255 motion as it relates to the affidavit. The parties presented argument but did not introduce any additional witnesses. Having determined that Mr. Walker's statements to Mr. Hailey and Mr. Miller were supported by sufficient indicia of trustworthiness, the Court admits those statements and has considered them here.

Section 2255 motions must be filed within a one-year period that begins to run, as relevant here, on "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). It can be inferred from Ms. Johnson's testimony that she first became aware of Mr. Walker's possible recantation only shortly before she met with him on August 1, 2014, and Mr. Clark only received Mr. Walker's affidavit in August of 2014. He filed the instant motion in April of 2015, well within the one year allowed by Section 2255. The United States does not affirmatively argue that the Rule 33 time bar must apply. See Section 2255 Opp'n at 10, n. 3. And, indeed, the Rule 33 time limit does not bar Mr. Walker's petition.

One early D.C. Circuit case suggests that Section 2255 motions based on the recantation of a witness's trial testimony may be subject to the Rule 33 three-year time limit. In United States v. Kearney, 682 F. 2d 214, 218-19 (D.C. Cir. 1982), the court of appeals – without elaboration – characterized a defendant's Section 2255 motion as "basically a motion for a new trial based on newly discovered evidence filed pursuant to Fed. R. Crim. P. 33." The court noted that the motion was "not filed in the timely fashion as required by that rule," but found it "not necessary to rely on [the Rule 33 time bar]" to deny the motion because it affirmed the District Court's denial of the Section 2255 motion on its merits. Id. See also United States v. Fields, 2006 U.S. Dist. LEXIS 2849, *5-6 (D.D.C. Jan. 18, 2006) (finding that defendant's Section 2255 motion based on recantations was time-barred under Rule 33, apparently because Rule 33 by its terms broadly embraces "any motion for a new trial grounded on newly discovered evidence") (quoting FED. R. CRIM. P. 33). Neither Kearney nor Fields offers an explanation for why the Rule 33 limitations period should be superimposed onto Section 2255 motions.

Despite its observation in <u>Kearney</u>, the D.C. Circuit has never *required* application of the Rule 33 time bar to Section 2255 motions. Indeed, it would seem inappropriate to do so, as the differing purposes of Rule 33 and Section 2255 counsel against imposing the Rule 33 time limit on colorable Section 2255 claims. Although the two mechanisms have substantial overlap, Rule 33 is clearly a step in the criminal proceeding, while Section 2255 is "arguably an independent civil action." 3 CHARLES A. WRIGHT & SARAH N. WELLING, FED. PRAC. & PROC. CRIM. § 591 (4th ed. 2011). Rule 33 predated Section 2255 and contains broader grounds for relief: whenever the "interest of justice" requires. <u>See</u> <u>id</u>. Rule 33 was originally intended to correct "certain problems . . . involved in the ending of a term of court and the start of another." <u>See</u> <u>Duggins v. United States</u>, 240 F.2d 479, 483 (6th Cir. 1957). "It was not [Rule 33's] purpose to meet the problems involved in habeas corpus proceedings or a collateral attack upon a judgment." <u>Id</u>. Conversely, it is those very proceedings and attacks with which Section 2255 is concerned. A proceeding under 28 U.S.C. § 2255 is "an independent and collateral inquiry into the validity of the conviction." <u>Rubenstein v. United States</u>, 227 F.2d 638, 642 (10th Cir. 1955). Such an independent inquiry appropriately commands a limitations period different from the period governing direct attack of the judgment. Current practice cautions against recharacterizing Section 2255 and Rule 33 motions without granting movants the opportunity to amend. <u>See</u> 3 WRIGHT & WELLING § 591. The substance of the grounds for relief determine whether a motion should be considered under Rule 33 or Section 2255. <u>Id</u>.

In short, Rule 33 and Section 2255 offer different mechanisms of relief for different kinds of claims. "Constitutional challenges to a conviction arising from conduct at trial . . . are generally brought pursuant to § 2255." <u>United States v. Campbell</u>, 2004 Lexis 30260, at *5-6 (D.D.C. Aug. 23, 2004) (quotations omitted). That is precisely the type of

challenge that Mr. Clark purports to assert: "a Fifth Amendment Claim that he has been deprived of his liberty without due process of law based upon the recantation of the testimony of the only witness who directly incriminated him at trial." See Section 2255 Second Reply at 15. In United States v. Campbell, Judge Hogan faced the similar question of whether to apply the Rule 33 time bar to a claim styled as a Section 2255 motion. The motion argued a potential violation of prosecutors' constitutional obligation to disclose exculpatory evidence. See United States v. Campbell, 2004 Lexis 30260 at *1. The court opted to "construe the motion as one brought pursuant to 28 U.S.C. § 2255." Id. at *5-6. That is because "[m]otions nominally under a Rule of Criminal Procedure, but raising arguments within the scope of § 2255, must be treated as collateral attacks." Id. (quoting United States v. Canino, 212 F.3d 383, 384 (7th Cir. 2000)). Mr. Clark has characterized his motion as a Section 2255 motion, and that description is appropriate in light of the relief sought. The Court will not apply the Rule 33 time bar to the motion.

2. Section 2255 Motions Based on New Evidence of Recantations

Under 28 U.S.C. § 2255, a federal prisoner may move to vacate, set aside, or correct a sentence that was "imposed in violation of the Constitution or laws of the United States, . . . [or] was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "The circumstances under which such a motion will be granted, however, are limited in light of the premium placed on the finality of judgments and the opportunities prisoners have to raise most of their objections during trial or on direct appeal." United States v. Henry, 821 F. Supp. 2d 249, 253 (D.D.C. 2011). Furthermore, "the recognized difficulties imposed on the government in re-prosecuting criminal cases long after" the relevant events must be balanced against granting new trials. United States v. Kearney, 682 F.2d at 219. Section 2255 is "not a substitute for direct appeal, so petitioner must show a good deal more than

would be sufficient [to warrant relief] on a direct appeal." <u>United States v. Mahdi</u>, 172 F. Supp. 3d 57, 63 (D.D.C. 2016) (quoting <u>United States v. Pollard</u>, 959 F.2d 1011, 1020 (D.C. Cir. 1992)); <u>see also</u> <u>United States v. Henry</u>, 821 F. Supp. 2d at 253.

This showing is particularly important for Section 2255 motions premised on recantations. Of course, courts must give due consideration to any colorable claim based on recanted testimony, "out of a concern for the possibility that the integrity of the trial's truth-finding function was compromised through a fraud on the Court." <u>See</u> <u>Avalos v. United States</u>, 2014 WL 12709022 at *2 (E.D. Va., Aug. 19, 2014). Even so, "[i]n this Circuit, recanting affidavits and witnesses are looked upon with the utmost suspicion by the courts." <u>United States v. Mahdi</u>, 172 F. Supp. 3d at 68 (quoting <u>United States v. Kearney</u>, 682 F.2d at 219). Recantations attract suspicion from courts because, where a trial witness later recants sworn testimony, "the witness is either lying now, was lying then, or lied both times." <u>See</u> <u>United States v. Earles</u>, 983 F. Supp. 1236, 1239 (N.D. Iowa 1997). The "stability and finality of verdicts would be greatly disturbed if courts were too ready to entertain testimony from witnesses who have changed their minds, or who claim to have lied at the trial." <u>Id.</u> at 1248 (quoting <u>United States v. Grey Bear</u>, 116 F.3d 349, 350 (8th Cir. 1997)). In fact, a motion for a new trial based on this kind of evidence often may be decided on the record alone, without an evidentiary hearing. <u>See</u> <u>United States v. Kearney</u>, 682 F.2d at 219 (quoting <u>United States v. Ward</u>, 544 F.2d 975 (8th Cir. 1976) ("[T]he necessity for a hearing is diminished in cases involving challenged testimony where the trial judge has had an opportunity to observe the demeanor and weigh the credibility of the witness at trial.")

Courts in this Circuit will find that Section 2255 petitioners are eligible for relief based on a witness recantation only if two requirements are met. First, the Court must be

"reasonably well satisfied" that the witness's trial testimony was in fact false. See United States v. Henry, 821 F. Supp. 2d at 258. The petitioner bears the burden of providing credible evidence that allows the Court to reach this conclusion. See id. (citing United States v. Mackin, 561 F.2d 958 (D.C. Cir. 1977)). Second, the "proponent of post-conviction relief bears the further burden of showing that, absent the recanted testimony, a new trial would *probably* produce an acquittal." United States v. Henry, 821 F. Supp. 2d at 260 (quoting United States v. Williams, 233 F.3d 592, 593 (D.C. Cir. 2000)) (quotations omitted). See also United States v. Kearney, 662 F.2d at 220; United States v. Mahdi, 172 F. Supp. 3d at 68.

### B. The Recanting Affidavit Cannot Support the Section 2255 Motion

Applying the two-prong test that is used in the D.C. Circuit, the Court finds that a new trial conducted without Mr. Walker's recanted testimony would "probably result in an acquittal." See United States v. Henry, 821 F. Supp. 2d at 260. The Court nevertheless must deny Mr. Clark's Section 2255 motion insofar as it is based on Mr. Walker's recanting affidavit, because it cannot be "reasonably well satisfied" that the trial testimony linking Mr. Clark to the crime was false. See id. at 258-60. This conclusion is dispositive, as both prongs of the test must be satisfied. If the recantation *were* sufficient to establish the falsity of the trial testimony, however – for example, under a standard more lenient than requiring courts to be "reasonably well satisfied" of the trial testimony's falsity – the outcome of Mr. Clark's motion would be different.

1. The Court Cannot be "Reasonably Well Satisfied" That the Trial Evidence was False

The Court cannot be confident enough in the recanting affidavit to be "reasonably well satisfied" that Mr. Walker's testimony at trial was false. In the context of Section 2255

motions based on such new evidence, the "reasonably well satisfied" prong is an exacting standard that defendants rarely attain. See United States v. Mahdi, 172 F. Supp. 3d at 67-68 (quoting United States v. Kearney, 682 F.2d at 219) ("In this Circuit, recanting affidavits and witnesses are looked upon with the utmost suspicion by the courts."). Recent recantation cases from this Circuit show a fact-specific inquiry in which judges consider a diverse array of factors to determine whether a particular recantation meets the "reasonably well satisfied" test. For example, in United States v. Henry, the court considered seven separate factors: the degree to which the recanted testimony had already been tested by cross examination at trial; the opportunity the court had to observe the recanting witness's demeanor at trial and the evidence corroborating the trial testimony; whether there was some explanation for the recanting witness's knowledge of facts about the crime other than having observed them directly; the length of time between the trial testimony and the recantation; the possibility that the recanting witness would appear in court to testify about the recantation; whether the threat of a perjury prosecution would effectively encourage the recanting witness to be truthful; and the nature of the relationship between the recanting witness and the defendant. See 821 F. Supp. 2d at 258-60. Similarly, in United States v. Mahdi, the court denied a Section 2255 motion after weighing the degree to which the recanted testimony was corroborated by other evidence; the recanting affiant's motive to falsify and his explanation for recanting; and the lengthy period between the trial testimony and the recantation. See 172 F. Supp. 3d at 67-70.

Upon considering the relevant factors in the instant case, the Court simply cannot be reasonably well satisfied that Mr. Walker's trial testimony was false. First, Mr. Walker waited almost four years after trial before deciding to recant, and courts are justifiably skeptical of the motives of affiants who wait many years before recanting. Such a lengthy delay "cast[s]

doubt on the veracity of his recantation." See United States v. Henry, 821 F. Supp. 3d at 259 (referring to gap of "more than four-and-a-half-years"). See United States v. Mahdi, 172 F. Supp. 3d at 69 ("the Court finds that [recanting witness's] identification of [another person] as the . . . shooter *eleven* years after the trial is totally unbelievable" where the recanting witness had admitted to perjuring himself in the past and where the court doubted his explanation for recanting).

Second, Mr. Walker's trial testimony has already been subjected to rigorous cross examination and argument. Although the trial jury could not have analyzed Mr. Walker's recantation, it did hear Mr. Walker admit to lying to the police about the identity of the attacker and his reasons for equivocating. See Dec. 8, 2010 Trial Tr. at 139; id. at 106-08, 132. And the jury learned of his prior convictions for crimes involving dishonesty (forgery and obtaining money by false pretenses). Id. at 61. Despite this knowledge, the jury still gave Mr. Walker's testimony enough weight to convict Mr. Clark. Mr. Walker has now invoked his Fifth Amendment privilege against self-incrimination, so there is little reason to believe that he will be available for cross examination on the details of his recantation (or its subsequent withdrawal).

Third, the relationship between Mr. Clark and Mr. Walker is longstanding and, on some of the evidence, has been reasonably close. Before asserting his Fifth Amendment privilege, the one substantive matter to which Mr. Walker did testify during the 2016 evidentiary hearing on the affidavit is that he and Mr. Clark were "childhood friends" and have known each other "at least over 20 years." See June 20, 2016 Hr'g Tr. at 10. They lived in the same neighborhood. Dec. 8, 2010 Trial Tr. at 62. The two men were in business together – the drug business – and they saw each other several times a week. Mr. Walker had Mr. Clark's number saved on his phone, and on at least some days they spoke multiple times. See id. at 66-69. Mr.

31

Walker agreed that he had developed a "significant relationship with the defendant," and implied that in 2008, the year before the attack, it was a "serious, really serious" business relationship. See id. at 63. Their families knew each other well enough that Mr. Walker's wife was a babysitter for Mr. Clark's daughter. See Recanting Affidavit at 6. In the recanting affidavit, Mr. Walker admits that Mr. Clark "was close to me." Id.

This close personal and professional relationship between Mr. Clark and Mr. Walker, enduring over an extended period of time, casts doubt on the veracity of the recanting affidavit. The evidence admits of two possibilities. If the Court credits the recanting affidavit, Mr. Walker knew that Mr. Clark did not commit the crime but was angry enough at Mr. Clark to falsely implicate him and lie about it while under oath at trial. If the Court credits the trial testimony, Mr. Walker knew Mr. Clark committed the crime and was angry enough at him to lie to the police, decide to kill Mr. Clark, and begin discussing these plans with others. See Dec. 8, 2010 Trial Tr. at 105-106. In either event, the Court finds that a relationship existed that may have interfered with Mr. Walker's desire to respect the law and speak truthfully about Mr. Clark. It is sufficiently close to cast doubt on the candor of Mr. Walker's statements on this matter. Cf. United States v. Henry, 821 F. Supp. 2d at 260 (explaining that "[c]ourts have routinely found that recantations by family members are entitled to lesser weight," and noting the "close relationship" between the defendant and the recanting witness, defendant's nephew).

Fourth, the Court considers whether the trial testimony that Mr. Walker now recants was corroborated by other evidence from the trial. Unlike the recanted testimony in Henry and Mahdi, Mr. Walker's trial testimony was not directly buttressed by the testimony from other witnesses at Mr. Clark's trial. Cf. United States v. Henry, 821 F. Supp. 3d at 259 (noting that the court could not be reasonably well satisfied that the trial testimony was false

because it was "corroborated by independent testimony offered by several other witnesses" who observed events at issue in the recanted trial testimony); United States v. Mahdi, 172 F. Supp. 3d at 69 (noting that, where two other eyewitnesses identified the defendant as the gunman who killed the victim, "extensive corroboration of [recanting witness's] trial testimony convinces the Court that his original account of the [victim's] murder was truthful"). In this case, by contrast, Mr. Walker was the only witness to identify Mr. Clark as one of the assailants.

To be sure, the testimony of other witnesses at trial *did* corroborate the fact that Mr. Walker was the victim of a crime and many details of that crime. For example, Officer DePrince's testimony tends to corroborate some of Mr. Walker's claims about the early phase of the events: that a Red Toyota Highlander was involved (Officer DePrince processed a red 2008 Toyota highlander after the attacks); that an assailant tore a gold chain from Mr. Walker's neck (a gold link was recovered from the Highlander); that the assailant tried to mask him with a bag from Downtown Locker Room (Office DePrince recovered a bag from that store); and that the attack bloodied Mr. Walker's shirt to the extent that he had to discard it (Officer DePrince recovered a bloody shirt from the car). See Part II.A.3, supra. Furthermore, lay witnesses Yonata Kalbi, Christel Antoine, and Carmen Isler corroborated certain aspects of Mr. Walker's account of the events at the 7-Eleven, the storage facility, and Kenilworth Towers, respectively. See Part II.A.2, supra. But this evidence does little to corroborate the testimony that Mr. Walker actually recanted – namely, that it was Mr. Clark who committed the crime. Neither Ms. Kalbi, Ms. Antoine, nor Ms. Isler identified Mr. Clark during their testimony.

There is other circumstantial evidence, however, that offers some corroboration of Mr. Walker's more specific claims at trial: that Mr. Clark was involved in these events. Undisputed testimony from Mr. Walker suggests that he was well-acquainted with his attacker.

For example, while his assailant was holding Mr. Walker captive and attempting to rob him during a circuitous drive around Washington, D.C. and Maryland, the attacker evidently took the time to stop for medical supplies, to wash blood from Mr. Walker's face, and to apply a bandage to his wound. The attacker gave Mr. Walker a shirt. He even apologized to Mr. Walker and gave him time to rest and recover – a brief respite before the assailant resumed his violent attempts to steal $150,000. See Dec. 8, 2010 Trial Tr. at 95-96. To put it mildly, these are not usual features of an armed robbery. They suggest that Mr. Walker and his assailant had a relationship that predated the crime, which may corroborate Mr. Walker's identification of Mr. Clark as one of the assailants. Mr. Walker's identification of Mr. Clark is also corroborated by circumstantial evidence that might suggest consciousness of guilt: Mr. Clark's flight to Georgia in the face of the charges against him and his refusals to provide a DNA sample. See also Dec. 8, 2010 Trial Tr. at 8, 194-200.

In short, corroboration of Mr. Walker's trial testimony by other trial evidence takes one of two forms. There is circumstantial evidence offering some (albeit indirect) support for Mr. Walker's identification of Mr. Clark as the assailant. And there is evidence that goes to matters that have not been recanted (with regard to the general course of the criminal conduct). Unlike the circumstances present in both Mahdi and Henry, there is no trial evidence that directly confirms the recanted testimony or otherwise disproves the recantation. Thus, the degree of corroboration does not itself require Mr. Walker's recantation to be discarded. Ultimately, however, the three factors discussed above – the lengthy interval between trial and recantation, the fact that the trial testimony was already tested for credibility, and the relationship between the witness and the defendant – undermine the Court's trust in Mr. Walker's recanting affidavit.

Finally, the Court has no adequate basis to determine which of the many accounts Mr. Walker has offered in the past ten years is the truth. On the day of the attack in May 2009, Mr. Walker told the police that he did not know his attacker. See Dec. 8, 2010 Trial Tr. at 132; Dec. 9, 2010 Trial Tr. at 137. Six days later, he told the police that his attacker was a man named Floyd. Dec. 8, 2010 Trial Tr. at 137. Thereafter, he gave Floyd Clark's surname to the police and confirmed that a photo of Mr. Clark was a photo of the man who attacked him. Dec. 9, 2010 Trial Tr. at 140-142 (referring to Government Exhibit 16). Mr. Walker repeated this identification while testifying under oath to the grand jury in May 2010 and while testifying under oath at trial in December 2010. See Dec. 8, 2010 Trial Tr. at 125. Three and a half years later, in August 2014, Mr. Walker executed a sworn affidavit to recant his accusation of Mr. Clark. See Recanting Affidavit. Later still, he withdrew his recantation and offered two different accounts of falsely executing the affidavit: first to Mr. Hailey in February 2015, and then in June 2016 to Mr. Miller. See United States v. Clark, 325 F. Supp. 3d. at 194-95. Even as he was attempting to withdraw his recantation, Mr. Walker did not present a consistent explanation of how and why he executed the recanting affidavit. He told Mr. Hailey that the recanting affidavit was motivated by fear for his safety and that he *did* read the affidavit before signing; he told Mr. Miller that the affidavit was motivated by a desire for leniency for Mr. Clark and that he did *not* read the affidavit before signing. See June 20, 2016 Hr'g Tr. at 57-62, 73-78. Nearly the only thing to emerge clearly from this morass is that Michael Walker lied under oath.

In these circumstances, the Court cannot be "reasonably well satisfied" that the trial evidence of Mr. Clark's involvement is false. By its very terms this is a subjective standard; applying it entails the Court's own assessment of how confident it can be in the recanting affidavit. Cf. United States v. Henry, 821 F. Supp. 2d at 258-60. In the context of the high bar

required of Section 2255 motions generally, and the skepticism with which courts regard recantations specifically, this Court has little confidence in the recanting affidavit. This Court *is* reasonably well satisfied that Mr. Walker was a victim of a crime, and that he told conflicting stories about his attackers. The Court holds, however, that Mr. Clark has not met his burden to produce credible evidence sufficient for the Court to be "reasonably well satisfied" of the falsity of the trial evidence concerning Mr. Clark's involvement in the crime. See Lopez v. Miller, 915 F. Supp. 2d 373, 405 (E.D.N.Y. 2013) ("[T]he court finds [the recantations] reliable to the extent they establish the limited proposition that [the witness] provided multiple inconsistent accounts of the shooting before, during, and after trial . . . ."). Accordingly, the Court concludes that Mr. Clark's Section 2255 motion cannot be granted on the basis of the new evidence in Mr. Walker's affidavit.

2. A New Trial without the Recanted Testimony Would Probably Lead to Mr. Clark's Acquittal

The "reasonably well satisfied" prong of the Section 2255 test is itself dispositive of Mr. Clark's motion. As noted, it is a high bar, and Mr. Clark cannot surmount it. Thus, unfortunately for Mr. Clark, whether he could satisfy the second prong -- whether a new trial absent the recanted testimony would probably acquit the defendant – is academic. Cf. United States v. Mahdi, 172 F. Supp. 3d at 68.

On this prong of the test, however, Mr. Walker fares much better. The government would have little to offer at a new trial in which Mr. Walker testified just as he had before, but simply did not identify Mr. Clark. The prosecutor acknowledged as much at trial. See Dec. 8, 2010 Trial Tr. at 11 (describing the importance of evidence that corroborates Mr. Walker's account and noting that "this is going to come down to the complaining witness, and whether the jury believes the complaining witness"). Other than Mr. Walker's confident

identification of Mr. Clark at trial, there is no direct evidence to connect Mr. Clark to these dangerous events. Whatever weight the circumstantial evidence discussed above may have carried in the context of the full testimony at the previous trial, the Court cannot say that any rational jury would convict Mr. Clark at a new trial featuring all of the original evidence except, crucially, for Mr. Walker's identification. The same result follows if a new trial jury considered all of the first trial's evidence plus the new evidence contained in the recanting affidavit. In that event, the jury would hear Mr. Walker vigorously inculpating Mr. Clark and in the same testimony – or through the recanting affidavit, if admitted – completely absolving him. That evidence would offer no basis for a jury to discern which account is truthful and further undermines Mr. Walker's credibility. A rational jury faced with this evidence could not find guilt beyond a reasonable doubt; it inevitably would acquit.

Mr. Walker's ever-shifting accounts are problematic because his testimony is the linchpin of what is, in essence, a single witness case. Accordingly, although it does not affect the outcome of the instant motion, the Court concludes that Mr. Clark has met his burden to produce credible evidence establishing that a new trial would probably result in an acquittal of Mr. Clark. See United States v. Henry at 260 (citing United States v. Williams, 233 F.3d at 593); see also United States v. Williams, 233 F.3d at 595 (assessing the probability of acquittal by reference to what "any rational juror could infer").


IV.    INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS:
FACTUAL BACKGROUND

In addition to his claim that the recanting affidavit constitutes new evidence, Mr. Clark's Section 2255 motion also advances two ineffective assistance of counsel claims arising from his sentencing and from the appeal of his resentencing. The trial jury convicted Mr. Clark

on December 13, 2010. The Court held a status conference on sentencing issues on June 9, 2011, sentenced Mr. Clark on August 11, 2011, and resentenced him following remand from the court of appeals on September 29, 2014. Trial counsel Joe Conte's withdrawal of an objection to a sentencing enhancement for obstruction of justice forms the basis of one of Mr. Clark's claims of ineffective assistance of counsel; the decision of appellate counsel Sandra Roland not to appeal that same sentencing enhancement is the basis for Mr. Clark's second claim of ineffective assistance of counsel. See Sec. 2255 Mot. at 5-6; Section 2255 Reply Declaration at 1.

As already discussed, Mr. Clark was held in contempt of court for refusing to provide a DNA sample. See Part II.A.3.a, supra. Accordingly, the presentence investigation report prepared by the Probation Office included in its Sentencing Guidelines calculation a two-level upward adjustment under for obstruction of justice pursuant to U.S.S.G § 3C1.1. The sentencing memorandum that Mr. Conte filed on behalf of Mr. Clark on June 7, 2011 included an objection to the obstruction enhancement, noting that Mr. Clark had already served 49 days for contempt of court that could not be credited against his sentence. See Defendant's First Memorandum in Aid of Sentencing at 3-4. At the status conference on June 9, 2011, the Court said: "I'm willing and prepared to listen to arguments, but I think it extremely unlikely that the defense will persuade me that there shouldn't be an obstruction enhancement in view of what happened in this case." June 9, 2011 Hr'g Tr. at 4-5.

The Court reiterated this view at the beginning of the sentencing proceeding on August 11, 2011. See Aug. 11, 2011 Sentencing Tr. at 6. Shortly thereafter, Mr. Conte said: "Just to make things easier, Judge, I'm withdrawing any objection to the obstruction enhancement." Aug. 11, 2011 Sentencing Tr. at 7. Later, Mr. Conte confirmed the Court's understanding that he had "abandoned the obstruction argument," id. at 21, and indicated that he

knew before the sentencing hearing he would withdraw the objection, see id. at 38. When the Court offered Mr. Clark the opportunity to speak before imposing sentence, Mr. Clark did not formally renew his objection to the obstruction enhancement or complain about Mr. Conte's performance, but he did emphasize his belief that he had refused the DNA test with justification. Id. at 42-44.

Mr. Clark now argues that Mr. Conte's conduct in these proceedings constituted ineffective assistance of counsel. Mr. Clark's Section 2255 motion includes his signed and sworn declaration that he had requested Mr. Conte to "argue against the 2-level obstruction of justice enhancement prior to sentencing and during the sentencing hearing on August 11, 2011," which Mr. Conte did not do. See Clark Declaration at 1.

The second ineffective assistance of counsel claim arises from Mr. Clark's appeals. Mr. Clark timely filed a notice of appeal from his initial sentence on August 12, 2011. See First Notice of Appeal at 1. On May 16, 2014, the United States Court of Appeals for the D.C. Circuit affirmed the judgment of conviction except as to the sentence on Count Two, vacated the sentence on Count Two, and remanded for resentencing on that count. See USCA Judgment. The court of appeals mandate issued on July 10, 2014. See USCA Mandate. Assistant Federal Public Defender Sandra Roland entered her appearance on behalf of Mr. Clark in this Court on July 29, 2014, and Mr. Clark was resentenced on September 29, 2014. See Amended Judgment; Minute Order of Sept. 29, 2014. At resentencing, the Court gave effect to the instructions of the court of appeals with respect to Count Two, reducing Mr. Clark's sentence by two years, but otherwise noted that, "the rest of the judgement and conviction will be exactly the same as it was." See Sept. 29, 2014 Resentencing Tr. at 8. Accordingly, the resentencing had no effect on the sentencing enhancement for obstruction of justice.

Ms. Roland filed a notice of appeal from the resentencing on Mr. Clark's behalf on October 1, 2014. See Second Notice of Appeal. The notice was the last action Ms. Roland took on behalf of Mr. Clark. On October 24, 2014, she filed with the court of appeals a motion for leave to withdraw as counsel for appellant, citing an "irreconcilable conflict of interest" between Mr. Clark and the Federal Public Defender. See Mot. for Leave to Withdraw as Counsel, United States v. Clark, Case No. 14-3068 (D.C. Cir. filed Oct. 24, 2014), Dkt. No. 1518852, at 1. The court of appeals granted the motion on October 27, 2014, and appointed Richard Seligman to represent Mr. Clark on appeal. Order, D.C. Cir. Dkt. No. 1519137, at 1.

On March 4, 2015, Mr. Seligman filed an unopposed motion to voluntarily dismiss the appeal that Ms. Roland had filed for Mr. Clark. The motion states that, "[a]fter being fully informed of the circumstances of his case and the consequences of a dismissal of his appeal, appellant has decided to seek a voluntary dismissal of his appeal." Motion for Voluntary Dismissal, D.C. Cir. Dkt. No. 1540714, at 1. Appended to the motion was a sworn affidavit from Mr. Clark explaining the motion:

> I wish to voluntarily dismiss my appeal of resentencing on Count 2 in the above case. In this regard, my attorney, Richard Seligman, has fully informed me of the circumstances of my case and of the consequences of the dismissal of my appeal. I understand that this dismissal is only of an appeal for any error with regard to resentencing for Count 2 [18 U.S.C. § 924(c)(1)(A)(ii)] and that it does not effect [sic] any other legal claims I may have including claims for ineffective assistance of counsel or newly discovered evidence.

Affidavit, D.C. Cir. Dkt. No. 1540714, at 1. The D.C. Circuit granted Mr. Clark's motion to dismiss his appeal on March 17, 2015, directing the Clerk to transmit the order in lieu of a formal mandate. Order, D.C. Cir. Dkt. No. 1542832, at 1.

Mr. Clark argues that Ms. Roland's conduct during the appeal of his resentence constitutes ineffective assistance of counsel. His Section 2255 motion includes a signed and sworn declaration indicating that he "requested Ms. Sandra Rowland [sic] to raise the obstruction of justice enhancement [sic] on direct appeal," that Ms. Roland "never filed the obstruction of justice enhancement on direct appeal as requested," and that Ms. Roland "advised [Mr. Clark] that the § 924(c) enhancement was the one issue to raise on direct appeal in light of Alleyne v. U.S. 2013" [sic]. Clark Declaration at 1. The court has no further information on the facts of Mr. Clark's communications with Ms. Roland.

## V.     INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS: ANALYSIS

### A. Legal Standard

As with each of the other grounds of his Section 2255 Motion, Mr. Clark bears the burden of establishing a denial of constitutional rights by a preponderance of the evidence. Daniels v. United States, 532 U.S. 374, 381-82 (2001). The Court evaluates claims of ineffective assistance of counsel, which implicate Sixth Amendment rights, under the two-part test set out in Strickland v. Washington, 466 U.S. 668 (1984). As the D.C. Circuit has explained, Strickland requires the defendant to establish the following:

> First . . . that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second . . . that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

United States v. Gooch, 842 F.3d 1274, 1279 (D.C. Cir. 2016) (quoting Strickland v. Washington, 466 U.S. at 687). See also United States v. Murray, 897 F.3d 298, 310-11 (D.C. Cir. 2018). A court begins with the "strong presumption" that "counsel's conduct falls within

the range of reasonable professional assistance." Strickland v. Washington, 416 U.S. at 689.

Importantly, the defendant must establish *both* deficient performance and prejudice in order to

prevail. Failure on either prong of the Strickland inquiry precludes relief. "If it is easier to

dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course

should be followed." Strickland v. Washington, 466 U.S. at 697. See also United States v.

Talbott, 233 F. Supp. 3d 181, 188 (D.D.C. 2017), aff'd, 709 F. App'x 20 (D.C. Cir. 2017)

("[T]his Court "need not determine whether counsel's performance was deficient before

examining the prejudice suffered by the defendant.").

       The Strickland test applies with equal force to claims concerning trial and

appellate counsel. See, e.g., Smith v. Murray, 477 U.S. 527, 535-36 (1986) (applying Strickland

to claim of attorney error on appeal); Payne v. Stansberry, 760 F.3d 10, 13 (D.C. Cir. 2014)

(noting that the Strickland standard applies to ineffective assistance of appellate counsel claims).

### B. *Mr. Clark Lacks a Valid Claim of Ineffective Assistance of Trial Counsel*

       Mr. Clark's claim fails with respect to his trial counsel because he cannot show

prejudice. Specifically, Mr. Clark has not established a "reasonable probability that, but for

counsel's unprofessional errors, the result of [his sentencing] would have been different." See

United States v. Gray-Burriss, No. 17-3031, slip op. at 5 (D.C. Cir. April 9, 2019) (quotations

omitted). See also United States v. Eli, 379 F.3d 1016, 1019 (D.C. Cir. 2004); accord Campbell

v. Smith, 770 F.3d 540, 549 (7th Cir. 2014) (applying this standard to deny claim that counsel

provided ineffective assistance by failing to object at sentencing to government's breach of plea

agreement). A "reasonable probability" means "a probability sufficient to undermine confidence

in the outcome." Strickland v. Washington, 466 U.S. at 698. The showing required for prejudice

does not set a high bar: "[t]he question isn't whether [defendant's] prison term would have been

drastically shorter—just whether it was reasonably likely that the prison term would not have been as long." See United States v. Murray, 897 F.3d at 312.

There is no such likelihood here. To prove prejudice, Mr. Clark must establish a reasonable probability that, but for Mr. Conte's withdrawal of the objection, the Court would not have applied the two-level sentencing enhancement to calculating the Guidelines level. Even had Mr. Conte pressed his objection, it is unlikely that the Court would not have included the enhancement. As the Court made clear to Mr. Conte before and during sentencing, the obstruction enhancement was clearly appropriate in light of Mr. Clark's refusal to comply with a valid order of this Court. See June 9, 2011 Hr'g Tr. at 5; Aug. 11, 2011 Sentencing Tr. at 6. Neither Mr. Clark's Section 2255 motion nor his memorandum in aid of sentencing establishes that the obstruction enhancement should not have been included in the calculation of the Guidelines range. By way of argument against the obstruction enhancement, Mr. Clark's sentencing memorandum says only that

> Mr. Clark objected to giving a second DNA sample because he had already provided a sample and did not want further invasion of his privacy. As a result he will not receive credit for 49 of the days he was incarcerated. The assertion of his constitutional right and the resulting incarceration should not be a predicate for a two level enhancement. Thus a two level increase is not warranted in this case.

See Defendant's First Memorandum in Aid of Sentencing at 3-4. Mr. Clark has the burden to prove that it is reasonably likely that the court would have declined to apply the obstruction enhancement. He cannot carry his burden with the conclusory statement that Mr. Clark enjoys a constitutional right to disregard a valid order from this Court to provide a DNA sample in aid of a criminal investigation.

Even assuming that the withdrawal of the objection *did* prejudice Mr. Clark, his ineffective assistance claim with respect to Mr. Conte fails under the first prong of Strickland for the independent reason that Mr. Conte's withdrawal of the objection did not "[fall] below an objective standard of reasonableness." See United States v. Sitzmann, 893 F.3d 811, 831 (D.C. Cir. 2018) (affirming without remand the district court's denial of ineffective assistance claims that were "either conclusory, insubstantial, or both"); see also Strickland v. Washington, 466 U.S. at 688 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."). In this analysis, Mr. Clark must overcome the "strong presumption" that "the challenged action might be considered sound trial strategy." See Strickland v. Washington, 466 U.S. at 689; see also United States v. Abney, 812 F.3d 1079, 1087 (D.C. Cir. 2016) (denying a claim of ineffective assistance of counsel at sentencing; explaining that, where the record does not make explicit "counsel's actual strategy or lack thereof," the "presumption may only be rebutted by showing that no sound strategy . . . could have supported the conduct") (quoting Thomas v. Varner, 428 F.3d 491, 500 (3d Cir. 2005)).

Here, there are at least two reasons why Mr. Conte's decision to withdraw his objection to the sentencing enhancement was supported by sound strategy. First, Mr. Conte was responding to the Court's clear expression of its intent to include the obstruction enhancement in its Guidelines calculations. The Court had itself held Mr. Clark in contempt for obstruction of justice for failure to produce a DNA sample during the pre-trial proceedings. After considering the written objection to the obstruction enhancement in Mr. Clark's memorandum, see Defendant's First Memorandum in Aid of Sentencing at 3-4, the Court informed the parties at the June 2011 status conference that it was "extremely unlikely" that the Court could be persuaded to forgo the enhancement. See June 9, 2011 Hr'g Tr. at 5. The Court repeated this sentiment at

the sentencing hearing itself, noting that the enhancement was "quite appropriate" in view of the circumstances. Immediately thereafter, Mr. Conte withdrew the objection to the obstruction enhancement "to make things easier" for the Court. See Aug. 11, 2011 Sentencing Tr. at 6. In withdrawing an objection that he reasonably believed to be fruitless, Mr. Conte simply reserved the Court's attention for areas where he hoped to improve Mr. Clark's sentencing prospects.

Second, where "the sentence enhancement was appropriate . . . defendant's counsel's failure to object [does] not fall outside the wide range of professionally competent assistance." United States v. Turley, 37 F. Supp. 2d 1262, 1265 (D. Kan. 1998) (denying claim of ineffective assistance of counsel premised on counsel's failure to object to obstruction of justice sentencing enhancement) (quotations omitted). Here, the sentence enhancement was appropriate. The Sentencing Guidelines provide for an enhancement "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." See United States Sentencing Guidelines § 3 C1.1. This Court granted the government's motion to compel production of DNA samples in aid of its investigation of the instant case. See DNA Order. Mr. Clark refused to provide the samples on two occasions, even after being informed by the Court that failure to provide the samples would result in contempt – which it did, on October 18, 2010. In the order terminating Mr. Clark's contempt, the Court specifically found that "the purpose of holding Mr. Clark in civil contempt was to coerce compliance" with the Court's order to provide DNA and hair samples "that were being gathered in anticipation of trial." See Order, Dkt. No. 58, at 1. In short, the Court's orders clearly establish that Mr. Clark "willfully obstructed . . . the investigation [or] prosecution" of this case, for purposes of the sentencing guidelines. See U.S.S.G. § 3C1.1. Because the enhancement was entirely appropriate under the Guidelines, trial

45

counsel's withdrawal of an objection to the enhancement was not unreasonable under the "prevailing professional norms." <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. at 688.

### C. *Mr. Clark Lacks a Valid Claim of Ineffective Assistance of Appellate Counsel*

To establish a claim of ineffective assistance of appellate counsel, Mr. Clark must prove the same elements that apply to ineffective assistance of trial counsel: that Ms. Roland performed deficiently and that her performance prejudiced Mr. Clark's appeal. <u>See</u> <u>Williams v. Martinez</u>, 683 F. Supp .2d 29, 32 (D.D.C. 2010) ("To show ineffective assistance of appellate counsel, [petitioner] must show that his appellate counsel's performance was (1) deficient and (2) prejudiced his defense such that there was a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.") (quotations and citation omitted). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." <u>Strickland v. Washington</u>, 466 U.S. at 700. Mr. Clark has failed to make both showings.

In the appellate context, a petitioner may establish deficient performance by showing that "his counsel was objectively unreasonable in failing to find arguable issues to appeal – that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them." <u>Peete v. United States</u>, 942 F. Supp. 2d 51, 54 (D.D.C. 2013) (quoting <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000)). The Court has no information on the nature of Mr. Clark's conversations with appellate counsel, other than that he asked Ms. Roland to raise the obstruction enhancement on appeal and she did not. <u>See</u> Clark Declaration at 1.

The procedural history of the case clearly establishes the reasonableness of this decision. Ms. Roland assisted Mr. Clark only with resentencing and the appeal thereof. The Court resentenced Mr. Clark on Count 2 only after remand from the D.C. Circuit, which

otherwise upheld every aspect of Mr. Clark's conviction and sentences. See May 16, 2014

Judgment, Dkt. No. 105. Under these circumstances, it was hardly unreasonable for Ms. Roland

to focus the appeal of the resentence to matters that were actually before the Court during

resentencing. Mr. Clark argues that Ms. Roland "*could have* raised the issue as plain error"

affecting his rights. See Section 2255 Second Reply at 16 (emphasis added). But the possibility

that the claim could be raised does not mean that counsel's decision not to press the claim is an

objectively unreasonable choice. Even assuming that the obstruction issue was non-frivolous at

that phase of the appeal, "[t]here is no constitutional right of criminal defendants to have

appellate counsel raise every nonfrivolous issue that the defendant requests. Jones v. Barnes,

463 U.S. 745, 754 n. 7 (1983). See also United States v. Bowman, 2018 WL 6308778 at *6

(D.D.C. Dec. 3, 2018). "Th[e] process of winnowing out weaker arguments on appeal and

focusing on those more likely to prevail, far from being evidence of incompetence, is the

hallmark of appellate advocacy." Smith v. Murray, 477 U.S. at 527, 536 (quoting Jones v.

Barnes, 463 U.S. at 751-52) (quotations omitted). Ms. Roland exercised the reasonable

discretion of appellate counsel; her performance did not fall beneath minimum standards of

competence.

Mr. Clark's claim of ineffective assistance of appellate counsel fails for the

independent reason that, even assuming Ms. Roland's performance was deficient, Mr. Clark

cannot establish that he was prejudiced by her performance. Mr. Clark "must show a reasonable

probability that, but for his counsel's [error], he would have prevailed on his appeal." Peete v.

United States, 942 F. Supp. 2d at 54 (quoting Smith v. Robbins, 528 U.S. at 285). In the instant

case, then, Mr. Clark must show that if Ms. Roland had appealed the obstruction enhancement,

the D.C. Circuit would have reached a different result in the proceeding with which Ms. Roland assisted him (i.e., the appeal following Mr. Clark's resentencing).

But Mr. Clark has a problem on this score: None of his briefing even *engages* the issue of prejudice. To wit, the declaration concerning the ineffective assistance claims states only that Ms. Roland failed to object to the enhancement on appeal and instead chose to focus on the Section 924(c) issues. <u>See</u> Clark Declaration. Mr. Clark's <u>pro se</u> reply in support of his Section 2255 Motion is devoid of argument on the appellate counsel claim. <u>See</u> Section 2255 Reply. The attached declaration adds only that he "unequivocally requested of Ms. Roland to raise the obstruction of justice enhancement on direct appeal" but that she did not. <u>See</u> Section 2255 Reply Declaration. Even the supplemental reply to the Section 2255 motion prepared with the aid of counsel is devoid of any attempt to describe how or why the D.C. Circuit would have acted differently had Ms. Roland raised the obstruction enhancement. <u>See</u> Section 2255 Second Reply at 15-17.

Furthermore, there is little chance that, even had Mr. Clark addressed the question of prejudice, Mr. Clark or his counsel could have established a reasonable probability that, but for Ms. Roland's alleged errors, the court of appeals would have acted differently. <u>See</u> <u>United States v. Smoot</u>, 918 F.3d 163, 168 (D.C. Cir. 2019). First, the obstruction of justice enhancement was appropriately applied, as discussed above. Second, in the <u>per curiam</u> order that largely affirmed this Court's initial sentence, the court of appeals gave no indication as to its sentiments concerning the obstruction enhancement, and certainly nothing to encourage the viability of Mr. Clark's argument against the enhancement. <u>See</u> USCA Judgment. Similarly, the court of appeals -- acting on Mr. Clark's unopposed motion to dismiss – dismissed his appeal of the resentence without discussing the merits. <u>See</u> Order at 1, D.C. Cir. Dkt. No. 1542832. <u>See</u>

<u>also</u> Dkt. No. 113.  In short, Mr. Clark has not established (or attempted to establish) any prejudice from Ms. Roland's conduct in this case.

VI.    CONCLUSION

For the foregoing reasons, the Court will deny the new evidence and ineffective assistance of counsel claims presented in the motion [Dkt. No. 114] to vacate, set aside, or correct Mr. Clark's sentence under 28 U.S.C. § 2255.  The Court reserves for later resolution the claim presented in the supplement to defendant's motion [Dkt. No. 132], that Mr. Clark's sentence on Count Two under 18 U.S.C. § 924(c) is now unconstitutional.  The Court will consider this claim after the Supreme Court of the United States decides <u>United States v. Davis</u>, No. 18-43.  In resolving that claim, the Court will consider all relevant information and argument from Mr. Clark's initial Section 2255 motion [Dkt. No. 114].

Mr. Clark's Section 2255 motion consists of Dkt. No. 114 as amended by Dkt. No. 132; today's opinion resolves three of Mr. Clark's claims but leaves the motion open until the Court is able to resolve his fourth claim.  Accordingly, the motion [Dkt. No. 114] will be denied in part and held in abeyance in part.  An Order giving effect to this Opinion shall issue this same day.

PAUL L. FRIEDMAN
United States District Judge

DATE: 4|22|19